**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| VICTORY ENERGY OPERATIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 25-cv-00445-SH |
| | ) | |
| COLLINS & COLLINS MECHANICAL, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the Court is Defendant's motion to dismiss this matter for lack of personal jurisdiction or, alternatively, to transfer the case to the Eastern District of Pennsylvania.[1] Much of the parties' venue and jurisdictional dispute centers around which documents formed the offer and acceptance of a $5 million contract between Plaintiff Victory and Defendant Collins.

Version One:  The "offer" was the 49-page proposal from Victory to Collins, negotiated over a period of months, and containing extensive details as to the specifications of two specially designed industrial boilers.  The "acceptance" was Collins' subsequent purchase order, which referenced Victory's proposal and attached two pages from the proposal and a related email.  In this version, Victory is bound by the many promises it makes regarding the boiler to be delivered and installed; Collins is bound by its payment and other obligations; and both parties are bound by the contract's venue provision.

---

[1] The parties have consented to the jurisdiction of a U.S. Magistrate Judge for all purposes under 28 U.S.C. § 636(c)(1) and Fed. R. Civ. P. 73(a).  (Dkt. No. 19.)

Version Two:  The "offer" was Collins' three-page purchase order, which very generally describes the boilers and other components—as well as pricing—but which contains few other details.  The "acceptance" was Victory's invoice for the first payment due under the pricing plan.  In this version, Victory appears bound by little more than a general description of the types of boilers and related systems it will provide; Collins is bound only to pay on the schedule; and the other 47–48 detailed pages of drawings, pictures, specifications, data charts, supply and installation obligations, guarantees, and other terms and conditions are out the window.

Version Two strains credulity.  For purposes of determining jurisdiction, Victory has demonstrated that the parties' contract includes an agreement that the state and federal courts in Tulsa County, Oklahoma, are the exclusive forum for disputes arising out of the sale.  Collins has consented to the personal jurisdiction of Oklahoma, and transfer to a different venue is not appropriate.  Even without the forum-selection clause, Collins would be subject to personal jurisdiction in Oklahoma, and the Court would not transfer this case.

## Procedural Background

Plaintiff Victory Energy Operations, LLC ("Victory") has sued Defendant Collins & Collins Mechanical, Inc. ("Collins") in the Northern District of Oklahoma.  (Dkt. No. 2.) According to the complaint, Victory is an Oklahoma-based manufacturer of industrial boilers, while Collins is a Pennsylvania company that specializes in heating, ventilating, and air conditioning services. (*Id.* ¶¶ 2, 8–9.)  Victory's complaint centers around unpaid invoices for work done under Collins' Purchase Order P7150-2R1, relating to two boilers to be installed at Temple University ("Temple").  (*Id.* ¶¶ 10–24.)  Victory asserts claims for breach of contract, quasi-contract, and unjust enrichment.  (*Id.* ¶¶ 25–39.)

2

Collins moves to dismiss under Rule 12(b)(2), arguing (1) it is not subject to a forum-selection clause contained in the terms and conditions, and (2) the Court otherwise lacks personal jurisdiction over it. (Dkt. No. 12 at 10–23.[2]) Alternatively, Collins argues the Court should transfer this case to the Eastern District of Pennsylvania for the convenience of the parties under 28 U.S.C. § 1404(a). (*Id.* at 23–25.)

## Analysis

I.     **Collins' Motion to Dismiss for Lack of Personal Jurisdiction**

A.     **Standard of Review**

For a court to resolve a case, it must have "power over the parties before it (personal jurisdiction)." *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017). Here, the parties have presented the jurisdictional question via written materials, and the Court has not held an evidentiary hearing. Therefore, the plaintiff bears the burden of making a prima facie showing of "facts that if true would support jurisdiction over the defendant." *See OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998). To determine whether Victory has made this showing, the Court considers the affidavits and other written materials submitted by the parties, *id.*, and resolves all factual disputes in the plaintiff's favor, *Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1524 (10th Cir. 1987). The Court will also consider any non-conclusory allegations in the complaint not controverted by the defendant's affidavits.[3] *Id.*

B.     **Factual Background**

Applying this standard of review, the Court considers the following facts:

---

[2] Page numbers refer to those in the court-provided header.

[3] Neither party disputes the authenticity or ability of this Court to consider submitted documents. The Court, therefore, looks first to the evidence submitted by the parties and relies on that evidence over any allegations in the complaint.

Victory, a limited liability company headquartered in Collinsville, Oklahoma, manufactures industrial boilers. (Dkt. No. 2 ¶¶ 1, 8.) Victory is wholly owned by a Maryland corporation that has its principal place of business in Texas. (*Id.* ¶ 1.) Collins is a Pennsylvania corporation that specializes in heating, ventilating, and air conditioning services. (Dkt. No. 12-1 at 2 ¶ 4.)

In 2020, Temple issued a request for proposal ("RFP") for design-build contractor services on a project concerning boiler replacements and plant upgrades. (*Id.* at 2 ¶ 5; *id.* at 7–16.) The Temple RFP noted that certain suppliers, like Victory, had been prequalified based on their work on previous projects. (*Id.* at 14.) Victory was the only prequalified boiler manufacturer. (*Id.*) Proposals submitted under the RFP were to use prequalified suppliers, although Temple would entertain competitive proposals from certain other, listed suppliers. (*Id.*)

In March 2021, Collins contacted Victory by email (and perhaps phone) and requested Victory submit a proposal for work on the Temple project.[4] (Dkt. No. 12-1 at 3 ¶ 9; Dkt. No. 29-1 ¶¶ 2–3.) Specifications for the boilers were provided by Temple. (Dkt. No. 12-1 at 3 ¶ 11.) Victory did not initiate contact with Collins, nor did it request Collins consider it as a subcontractor. (Dkt. No. 29-1 ¶ 2.) The parties eventually contracted for Victory to design and manufacture custom-made industrial boilers and associated equipment at its facility in Oklahoma. (*Id.* ¶ 10.)

Victory sent Collins its first proposal, dated March 25, 2021. (*Id.* ¶ 3; Dkt. No. 29-2.) The proposal was 47 pages long and contained sections titled: Summary Technical

---

[4] The parties had previously worked together on another Temple project in 2008, but no detail is provided as to the nature and length of the parties' prior working relationship. (Dkt. No. 12-1 at 3 ¶ 7.)

Proposal and Terms; Boiler Descriptions; Burner, SCR, & Controls; Feedwater Economizer, Ductwork, & Stack; Ladders and Platforms; Boiler Water Chemistry Recommendations; General Clarifications; Clarifications to Specifications; and Preliminary Performance. (Dkt. No. 29-2.) The proposal contained detailed information regarding the equipment to be manufactured, tested, and installed. (*Id.*) The proposal anticipated a lengthy, interactive project: 12–14 weeks for engineering drawings, followed by a 15-day period for Collins to approve the drawings, then 30 weeks to fabricate the equipment and move it to a test facility, and four weeks for factory fire tests. (*Id.* at 5 § 1.4.) It also noted that Victory's "Terms and Conditions of Sale" applied. (*Id.* at 4 § 1.3.) Those terms and conditions were included with the proposal and contained an agreement that "the state and federal courts located in Tulsa County, Oklahoma, shall be the exclusive forum for any cause of action . . . arising out of the execution of or performance under" the buyer's purchase order or the contract referenced therein. (*Id.* at 37 (Definitions); *id.* at 39 ¶ S (Governing Law and Arbitration).) There was no price listed in this proposal. (*Id.* at 3.)

Collins and Victory communicated regarding changes to the project, and, on March 31, 2021, Victory sent a revised, 48-page proposal. (Dkt. No. 29-1 ¶ 4; Dkt. No. 29-3.) The new proposal added a section for emissions guarantees, among other changes. (*See, e.g.*, Dkt. No. 29-3 at 28 § 3.6.) It also provided a total price for project. (*Id.* at 3 § 1.1 (with and without optional freight).) Many of the other provisions remained the same, including the forum-selection clause. (*Id.* at 4 § 1.3, 40 ¶ S.) Collins treats this proposal as the first one made by Victory. (Dkt. No. 12-1 at 3 ¶ 10.)

Over the next three months, Collins continued communicating with Victory, forwarding addendums and clarifications regarding product specifications so that Victory

5

could revise its proposal accordingly. (Dkt. No. 29-1 ¶ 5; *see also* Dkt. No. 12-1 at 19 (June 28 email discussing materials that would reduce price and releasing Victory with the purchase order to procure materials so Victory could "lock in pricing").) On June 29, 2021, Collins asked Victory to send an updated proposal showing the adjusted numbers. (Dkt. No. 12-1 at 18.)

On June 29, 2021, Victory submitted the new proposal to Collins. (Dkt. No. 29-1 ¶ 6; Dkt. No. 12-1 at 21–68.) This new proposal contained language releasing Victory to procure major materials upon receipt of Collins' purchase order and added some flexibility to the tubing to be used. (Dkt. No. 12-1 at 25 § 1.4, 31 § 2.4.) The price was also reduced by $73,243.00. (*Compare* Dkt. No. 12-1 at 23 § 1.1 *with* Dkt. No. 29-3 at 3 § 1.1.) Again, many other provisions remained the same, including the forum-selection clause. (Dkt. No. 12-1 at 24 § 1.3, 60 ¶ S.) Victory's proposal stated that it would be valid for 30 days. (*Id.* at 24 § 1.3.)

The parties continued to discuss the terms of the proposal. (Dkt. No. 29-1 ¶ 7.) Then, on July 13, 2021, Collins issued a purchase order to Victory. (Dkt. No. 12-1 at 3 ¶ 12; Dkt. No. 29-1 ¶¶ 7–8; Dkt. No. 29-4.) As it related to the equipment portion of the pricing, the purchase order included the parenthetical "(SEE ATTACHED QUOTE FOR DETAIL)." (Dkt. No. 29-4 at 1.) The July 13 purchase order attached Section 1.0 (Summary Proposal and Terms) of the June 29 proposal (*id.* at 5–7), but not the other 43 pages containing the details of the boiler to be manufactured or the services to be performed. The attachment included the "Milestone Payment Schedule" from the proposal, but the face of the purchase order contained different terms, noting "PAYMENTS SHALL BE MADE ONLY WHEN PAYMENTS ARE RECEIVED BY CONTRACTOR FROM OWNER. PAYMENTS WILL HAVE 10% RETENTION WITHHELD." (*Id.* at 1, 5.) In response to this purchase order, Victory and

Collins discussed changes to Victory's June 29 proposal by telephone.  (Dkt. No. 29-1 ¶ 8; Dkt. No. 29-5 at 1.)

Following the phone conversation, on July 14, 2021, Victory emailed markups on the Collins' purchase order.  (Dkt. No. 29-5 at 1.)  These included deleting Collins' payments-only-when-received language and altering the final payment on the Milestone Payment Schedule from Victory's June 29 proposal.  (*Id.* at 3, 9.)  Victory also sent over a new, "As Sold" version of the proposal.[5]  (*Id.* at 1, 10–58; Dkt. No. 29-6.)  This 49-page proposal contained a new section for "Additional QC Services," with a price for that optional add-on.  (Dkt. No. 29-6 at 3 § 1.1, 38 § 10.0.)  It also contained the previously redlined update to the Milestone Payment Schedule.  (*Id.* at 5 § 1.5.)  Again, many of the other provisions remained the same—including the forum-selection clause—and, again, the proposal stated that it would be valid for 30 days.  (*Id.* at 4 § 1.3, 41 ¶ S.)

On July 20, 2021, Collins issued a new purchase order to Victory.  (Dkt. No. 12-1 at 70–72.)  This purchase order contained the same services (including the additional QC services) and pricing as Victory's July 14 proposal.  (*Id.* at 70.)  The purchase order again referenced the "ATTACHED QUOTE."  (*Id.*)  This time, attached to the purchase order was section 1.1 of the July 14 proposal, as well as the redline containing the changes to the Milestone Payment Schedule from the June 29 proposal that were included—in clean form—in the July 14 proposal.  (*Id.* at 71–72.)  The attachments did not include the page containing sections 1.2 (Start-up, and Training) and 1.3 (Terms & Conditions of Sale) of

---

[5] This proposal was not referenced in the original complaint.  (Dkt. No. 2.)  As noted above, however, the Court has been asked to decide personal jurisdiction based on the affidavits and other written materials submitted by the parties.  While the Court resolves all disputes in the plaintiff's favor, Collins does not question the existence and communication of this proposal.

the proposal, nor did it include the remaining 44 pages of the July 14 proposal outlining all details regarding the boiler to be manufactured or the services to be performed. (*Compare* Dkt. No. 29-6.)  Upon receipt of the July 20 purchase order, Victory immediately accepted it and sent an invoice for a little over $1.2 million—the 25% due "Upon Receipt of Purchase Order" under the terms of the July 14 proposal.  (Dkt. No. 2 ¶ 13; Dkt. No. 12-1 at 74, 76–77; Dkt. No. 29-6 at 5 § 1.5.)  Attached to the invoice was a set of "Terms and Conditions of Sale" that were similar, but not identical, to the Terms and Conditions of Sale included in the July 14 proposal.[6]  (*Compare* Dkt. No. 12-1 at 77 *with* Dkt. No. 29-6 at 39–43.)  The forum-selection clauses, however, were the same. (*Compare* Dkt. No. 12-11 at 77 ¶ S *with* Dkt. No. 29-6 at 41 ¶ S.)

On July 28, 2021, Temple officially selected Collins to be its contractor and issued a purchase order for the boiler replacement project.  (Dkt. No. 12-1 at 4 ¶ 18; *id.* at 79–80.)

Following the July 20 purchase order, Victory began drafting drawings for the equipment.  (Dkt. No. 29-1 ¶ 11.)  This involved extensive technical work by Victory at its Oklahoma facility.  (*Id.*)  Collins was highly involved in this process, exchanging numerous communications with Victory regarding preparation, modification, and approval of the drawings.  (*Id.*)  Following drafting, Victory began fabrication, also at its Oklahoma facility.  (*Id.* ¶ 12.)  This process took many months and involved significant

---

[6] At no point during the negotiations of Victory's many proposals from March 25 through July 20, 2021, did Collins reject or otherwise strike through the forum-selection clause contained therein.  (Dkt. No. 29-1 ¶ 9.)  Conversely, at no point after Victory issued its first invoice did Collins discuss or express its assent to the invoice's attached terms and conditions.  (Dkt. No. 12-1 at 4 ¶ 17.)

work by Victory's Oklahoma employees. (*Id.*) Victory then conducted extensive factory testing of the equipment in Oklahoma. (*Id.* ¶ 13.)

In September 2022, Temple sent a representative to Victory's Oklahoma facility to observe the boiler factory fire test. (*Id.* ¶ 17.) The representative was permitted to attend the test by virtue of Victory's contract with Collins.[7] (*Id.*) Collins could have sent its own representative, but a representative of its customer came instead. (*Id.*)

Over the course of their relationship, Collins submitted several payments to Victory in Oklahoma for its project-related work and exchanged numerous communications with Victory related to negotiation of the original contract, contract performance, and payment. (*Id.* ¶¶ 14–15.) This likely included over one hundred phone calls and hundreds-to-thousands of emails. (*Id.* ¶ 15.) Based on the complexity of the customized manufacturing to be performed by Victory, Collins knew the job would be long and complex and that it would require extensive communication and coordination. (*Id.* ¶ 16.)

Victory delivered Boiler #1 in November 2022, and Boiler #2 in August 2023. (Dkt. No. 12-1 at 4 ¶ 19.) Both boiler systems were accepted by Temple and have satisfied compliance tests. (Dkt. No. 2 ¶ 14.)

Victory now sues to recover on four invoices issued between November 2023 and December 2024, which it argues Collins improperly failed to pay. (*Id.* ¶¶ 15–22.) Collins implies that these invoices relate to work performed on the boilers after they were

---

[7] The July 14 proposal states that the boiler factory fire test shall be conducted pursuant to section 1.2 of the proposal. (Dkt. No. 29-6 at 33 § 8.0.) Section 1.2 of the proposal governs factory testing and notes that "[h]ands on training for customer personnel is available in conjunction with the factory operational testing." (*Id.* at 4 § 1.2.)

delivered to Temple in Pennsylvania.  (Dkt. No. 12-1 at 4 ¶¶ 20–21.)  Victory's witnesses in this case are in Oklahoma.  (Dkt. No. 29-1 ¶ 19.)

### C. The Forum-Selection Clause

Both parties spend much of their briefing focused on whether Collins has consented to personal jurisdiction in Oklahoma by agreeing to Victory's forum-selection clause, so the Court will start there.

### 1. Forum Selection and Personal Jurisdiction

The requirement of personal jurisdiction is an individual right and one that can be waived by a "variety of legal arrangements." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (noting that freely negotiated forum-selection provisions are a circumstance where a party may give express or implied consent to personal jurisdiction).  As such, the "use of a forum selection clause is an example of an express consent to personal jurisdiction." *Olivares v. C.R. England, Inc.*, No. 2:22-cv-00123-JNP-JCB, 2022 WL 3025974, at *2 (D. Utah Aug. 1, 2022) (citation modified); *see also Roberson v. Farkas*, No. CV 09-795 JCH/WDS, 2010 WL 11452688, at *2 (D.N.M. June 30, 2010) ("a party may consent to personal jurisdiction by including a forum selection clause within a contract, and such clauses are typically viewed as prima facie establishment of personal jurisdiction over a defendant"); 4 Wright & Miller's Federal Practice & Procedure § 1067.3 & n.42 (4th ed.) ("[c]onduct that has been held to constitute consent or a constructive waiver often includes . . . entering into an agreement with a forum-selection clause" (collecting cases)).

The parties' arguments here assume that—if the forum-selection clause is part of their contract—then the Court has personal jurisdiction over Collins to adjudicate the

current dispute.  (*See, e.g.*, Dkt. No 29 at 16; Dkt. No. 30 at 5.)  No party argues that the forum-selection clause is unreasonable or otherwise inherently unenforceable, nor do they dispute that its terms are mandatory.  The only question is—was the clause a part of the parties' contract?

### 2.    The Parties' Contract Includes the Forum-Selection Clause

"In determining whether a forum selection clause is part of an agreement, a federal court . . . applies state contract law, rather than federal law." *Saint Francis Home Med. Equip., L.L.C. v. Sunrise Med. HHG, Inc.*, No. 08-CV-224-TCK-PJC, 2009 WL 2461327, at *5 (N.D. Okla. Aug. 10, 2009).  The parties here agree that Oklahoma's Uniform Commercial Code ("UCC") governs the determination of whether their contract includes the at-issue forum-selection clause.  (*E.g.,* Dkt. No. 12 at 10, 12–14; Dkt. No. 29 at 15.)  They disagree, however, on how that contract was formed.

### a.    The Parties' Arguments

Collins argues that its July 20 purchase order was the offer, and Victory's July 20 invoice an attempted acceptance—albeit one that was thwarted by the conditional acceptance clause contained in the terms and conditions attached to the invoice.[8]  (Dkt. No. 12 at 11; Dkt. No. 30 at 3–4.)  Because of this, Collins argues, no contract was formed until the parties began performing.  (Dkt. No. 12 at 11–12; Dkt. No. 30 at 4.)

---

[8] The terms and conditions included the following clause:  "THE COMPANY'S ACCEPTANCE OF ANY OFFER BY BUYER TO PURCHASE THE PRODUCTS IS EXPRESSLY CONDITIONAL UPON THE BUYER'S ASSENT TO ALL THE TERMS AND CONDITIONS HEREIN, INCLUDING ANY TERMS ADDITIONAL TO OR DIFFERENT FROM THOSE CONTAINED IN ANY BUYER'S OFFER TO PURCHASE OR THE ORDER.  THESE TERMS AND CONDITIONS ARE MADE A PART OF AND GOVERN THE ORDER."  (Dkt. No. 12-1 at 77.)

Viewed in this light, under Oklahoma's UCC, the forum-selection clause attached to the invoice was an additional or different term included in the "expression of acceptance," and that acceptance was "expressly made conditional on assent to the additional or different terms."  Okla. Stat. tit. 12A, § 2-207(1).  Collins did not assent to the additional or different terms, so no acceptance occurred at the time of the invoice. Instead, Victory accepted the offer in Collins' purchase order by beginning the requested performance.  *See id.* § 2-206(1)(a) ("Unless otherwise unambiguously indicated by the language or circumstances . . . an offer to make a contract shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances . . . ."); *see also* U.C.C. § 2-206 cmt. 3 ("The beginning of performance by an offeree can be effective as acceptance so as to bind the offeror only if followed within a reasonable time by notice to the offeror.").  Therefore, in Collins' view, the contract is limited to the scant details included with the purchase order, plus any stock gap-fillers found in the UCC.  *See* Okla. Stat. tit. 12A, § 2-207(3) (noting conduct may establish a contract when writings fail, in which case "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act").

Victory, meanwhile, argues that the July 14 proposal was the offer and Collins' July 20 purchase order the acceptance.  (Dkt. No. 29 at 13.)  Viewed in this light, the forum-selection clause included in the proposal was part of the offer, and the offer was likely a firm offer.  *See* Okla. Stat. tit. 12A, § 2-205 ("An offer by a merchant to . . . sell goods in a signed record which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated . . . .").  Collins accepted the offer, even if the July 20 purchase order stated terms additional to or different from those offered or

agreed upon.[9]  *See id.* § 2-207(1).  Under Victory's reading, it is irrelevant whether any terms from Collins' acceptance became part of the contract, because none of those terms added to or contradicted the forum-selection clause contained in the offer.

The question then becomes whether Victory's July 14 proposal was the offer, or whether the offer was Collins' July 20 purchase order.  To make that determination, the Court must look to the common law.  *See* 1 White, Summers, & Hillman, Uniform Commercial Code § 2:25 (6th ed.) ("The Code does not define 'offer,' and courts must resort to extra-Code contract law via § 1-103 to determine whether a party has made an offer."); *see also* Okla. Stat. tit. 12A, § 1-103(b) ("Unless displaced by the particular provisions of the [UCC], the principles of law and equity, including . . . the law relative to . . . other validating or invalidating cause shall supplement [the UCC's] provisions."); *First Bank of Okarche v. Lepak*, 1998 OK 46, ¶ 15, 961 P.2d 194, 198 ("The common law supplements the UCC in Oklahoma unless a particular section provides that it does not.").

### b.    The July 14 Proposal Was an Offer, Accepted by Collins' July 20 Purchase Order

Under Oklahoma law, an "offer is the expression of a person's willingness to become a party to an agreement and entails a willingness which could be considered a definite commitment." *Sharp v. 251st St. Landfill, Inc.*, 1991 OK 41, ¶ 45, 810 P.2d 1270, 1282, *overruled on other grounds by DuLaney v. Okla. State Dep't of Health*, 1993 OK 113, 868 P.2d 676; *see also Strahm v. Bd. of Trs. of Benevolent & Protective Ord. of Elks*, 1950 OK 295, ¶ 9, 225 P.2d 159, 161 ("The expression of a person's willingness to become,

---

[9] Victory treats Collins' July 20 acceptance as stating a different term on the Milestone Payment Schedule.  (Dkt. No. 29 at 13.)  As noted above (*supra* at 7), the redline attached to the purchase order is the same as that attached to Victory's July 14 email conveying the new proposal, and it appears this redline is substantively the same as the July 14 proposal.  (*Compare* Dkt. No. 12-1 at 72 *with* Dkt. No. 29-5 at 9 & Dkt. No. 26-6 at 5.)

according to the terms expressed, a party to an agreement, is called an offer or proposal." (quoting Pollock on Contract (8th ed)).

Corbin on Contracts cites to various factors that may be useful in determining whether a communication is an offer.[10]  *See*  1 Corbin on Contracts § 2.2 (2026).  These include (1) the ordinary meaning of language in context; (2) prior communications between the parties, e.g., whether the communication was a response to a request for offer; (3) the selectivity of the communication; (4) any prior practices of the parties; (5) local or trade usage; (6) the social relationship between the parties; (7) the relative completeness of terms, with a more complete proposal being more likely to be seen as an offer; (8) the subject matter of the contract; and (9) foreseeability of reliance by the addressee.  *Id.*  Through all of this, the Court focuses "entirely upon objective behavior, asking whether there was mutuality of assent as manifested by the conduct of the parties." *Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1002–03 (10th Cir. 2001) (citation modified) (applying Oklahoma's UCC).  The Court also bears in mind that, under the UCC, a contract may be made in any manner sufficient to show agreement.  Okla. Stat. tit. 12A, § 2-204(1).

First, although never determinative, *see* Corbin § 2.2, the language of the proposal in context indicates that it is an offer.  The July 14 submission is deemed a "proposal"; in it, Victory indicates it "is pleased to submit our offering for your consideration"; and the proposal further states that it "is valid for a period of thirty (30) days."  (Dkt. No. 29-6 at 3–4.)  The attached terms and conditions reference "acceptance" of any offer of buyer to

---

[10] The Oklahoma Supreme Court often cites Corbin on Contracts.  *See Emrich Aerial Spraying LLC v. City of Pawhuska*, No. 25-CV-00115-SH, 2025 WL 2987889, at *13 n.29 (N.D. Okla. Oct. 23, 2025) (collecting cases).

purchase products, but it also defines the "Order" as the buyer's "purchase order or contract and documents and data referenced therein." (*Id.* at 39.) Moreover, it is not unusual for a proposal to constitute an offer that is accepted by a purchase order. *See Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1575 (10th Cir. 1984) (finding seller's "proposal constituted the offer and [the buyer's] . . . purchase order constituted the acceptance") (applying Pennsylvania's UCC).

Second, prior communications between the parties manifest an intent that the July 14 proposal be the offer. After Collins first reached out to Victory in March 2021, the parties were in consistent communication for months. Each time the parties discussed changes to the project, Victory would issue a new proposal, including at Collins' request. (*See supra* at 6.) For example, when Collins' first purchase order attempted to add terms to the June 29 proposal that were not acceptable to Victory, the parties again talked by telephone. (Dkt. No. 29-1 ¶ 8; Dkt. No. 29-5 at 1.) The result? Victory sent a new proposal, the July 14 "As Sold" version, incorporating the agreed-to changes. (Dkt. No. 29-5.) The parties' prior communications, thus, indicate that the July 14 proposal was an offer. *See* Corbin § 2.2 ("An initial communication will less likely be deemed an offer than a response to a request for an offer").

The third through sixth factors are not particularly relevant here. The July 14 proposal was selective, indicating it was more likely an offer than a mere advertisement— but this is not an area of dispute. The parties have provided no information regarding their prior practices or trade usages. And there is no social or familial relationship between the parties that might indicate a lack of intent to contract, but again this is not an area of dispute.

15

Seventh, the relative completeness of the terms indicates the July 14 proposal is an offer—it is highly detailed, containing over 49 pages of equipment descriptions; build and performance standards; pricing; comprehensive support and training regarding operation of the boiler systems; testing requirements; terms and conditions of sale; delivery method and payment schedule; warranties; and additional quality control services. (Dkt. No. 29-6.) Eighth, the subject matter of the proposal—for the sale of goods rather than real estate—leans slightly in favor of finding an offer. *See* Corbin § 2.2. Finally, it was foreseeable that Collins would rely on the proposal, e.g., "because the subcontractor can reasonably foresee that the proposal will be used by the general contractor in computing its bid." *Id.*

More importantly, the Court returns to the conduct of the parties and whether the July 14 proposal manifested a willingness to become a party to a contract with a definite commitment. It does. The July 14 proposal was an offer.

For many of the same reasons, Collins' July 20 purchase order also manifests an intent to accept Victory's offer. *See* White § 2:21 (noting the second form is generally an acceptance "unless the dickered terms are changed," and regardless of the printed labels on the forms). It specifically references Victory's July 14 proposal for the price stated, and it does not appear to be seeking a "new" deal. Nor does the July 20 purchase order, as Collins appears to argue, seek to enter a contract that only includes sections 1.1, 1.4, and 1.5 of the July 14 proposal—where it would pay over $5 million, but have no promises regarding, e.g., the emissions guarantees added as subsection 3.6 in the March 31 proposal, the training promised in subsection 1.2 of the proposal, or any of the other detailed specifications littered throughout the other 49 pages of the document.

16

Collins bases all its arguments against applicability of the forum-selection clause on its assertion that the July 20 purchase order was an offer, and not an acceptance. Collins does not dispute that, if the purchase order <u>was</u> an acceptance, it constituted an acceptance of the forum-selection clause contained in the proposal. The Court agrees. Collins accepted this clause. The purchase order was a "definite and seasonable expression of acceptance" of Victory's proposal to build and supply the equipment and related services referenced in the proposal. *See* Okla. Stat. tit. 12A, § 2-207(1). To the extent the acceptance contained additional or different terms, none of those related to forum selection. The Court, therefore, need not engage in a discussion of whether any additional or different terms became part of the contract under section 2-207(2). The forum-selection clause was part of the parties' contract.

Because Collins agreed to an exclusive Oklahoma-based forum for disputes relating to the contract, it has consented to personal jurisdiction in Oklahoma.

### D.    Personal Jurisdiction Absent Forum Selection

That said, even absent the forum-selection clause, the Court finds Oklahoma would have specific personal jurisdiction over Collins in this case.

### 1.    Personal Jurisdiction, Generally

A "State's authority to bind a nonresident defendant to a judgment" is constrained by the Due Process Clause of the Fourteenth Amendment.[11] *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Due process requires a defendant to have minimum contacts with the forum state, such that it "'should reasonably anticipate being haled into court there.'" *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 839–40 (10th Cir. 2020) (quoting *World-*

---

[11] State law may provide additional constraint, but Oklahoma's does not. *See Intercon, Inc. v. Bell Atl. Internet Sols., Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000).

*Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Here, Victory argues that the minimum contacts standard is met by specific jurisdiction—where a defendant has purposefully directed his activities at residents of the forum and the plaintiff alleges injuries arising out of or relating to those activities.  *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004).  If Victory shows such minimum contacts, the Court must also decide whether the exercise of personal jurisdiction offends traditional notions of fair play and substantial justice.  *TH Agric. & Nutrition, LLC v. Ace Eur. Grp. Ltd.*, 488 F.3d 1282, 1287 (10th Cir. 2007).  It is up to Collins to "demonstrate that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 1286 (citation modified).

> **2.    Victory Has Shown Collins Possesses the Requisite Minimum Contacts**
>
> **a.    The Standard—Defendant's Purposeful Direction & Injury Arising Out of Forum-Related Activities**

"Specific jurisdiction . . . is premised on something of a *quid pro quo:* in exchange for 'benefitting' from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1078 (10th Cir. 2008).  The physical presence of the defendant in the forum state is not required, so long as the defendant's efforts were purposefully directed at forum residents.  *Burger King*, 471 U.S. at 476.  As with any assertion of personal jurisdiction, the focus is on "contacts that the defendant *himself* creates with the forum State."  *Walden*, 571 U.S. at 284 (citation modified); *see also Burger King*, 471 U.S. at 475, 480 (noting the defendant's contacts must not be random, fortuitous, or attenuated); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) (noting the defendant's contacts must not be based

on the unilateral activity of another person).  The Court looks to both the quantity and quality of the defendant's contacts.  *OMI Holdings*, 149 F.3d at 1092.

A contract with a forum-resident, alone, is likely not enough to establish minimum contacts.  *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011).  But "parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other state for the consequences of their activities."  *Id.* (citation modified).  The Court must examine the parties' "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  *Id.* at 1166–67 (quoting *Burger King*, 471 U.S. at 479).  "That is, the contract relied upon to establish minimum contacts must have a 'substantial connection' with the forum state."  *TH Agric.*, 488 F.3d at 1288.

Once purposeful direction is established, "the specific personal jurisdiction test requires the plaintiff's injuries to arise out of defendant's forum-related activities."  *Newsome v. Gallacher*, 722 F.3d 1257, 1269 (10th Cir. 2013) (citation modified).  This means there must be "an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 262 (2017) (citation modified).

### b.    Collins Purposefully Directed Its Activities at Oklahoma

Most of Collins' arguments against purposeful direction rely on a counterfactual reading of the evidence.

For example, Collins argues it "did not solicit" Victory.  (Dkt. No. 12 at 17.)  Yet, the evidence is the opposite—showing it was Collins who contacted Victory in Oklahoma to

request a proposal for work on the Temple project. *See, e.g.*, *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1059 (10th Cir. 2008) ("significant to our analysis is the fact that Mr. Holiday approached Mr. Delia about becoming AST's European distributor, and then formed an ongoing business relationship" through "[p]hone calls, letters, facsimiles, and emails"). Collins attempts to avoid this fact by arguing that its actions were mandated by Temple. (Dkt No. 12 at 17.) But what the evidence shows is that Victory's "prequalified" supplier status was only part of Temple's RFP, that the RFP allowed competitive proposals using suppliers other than Victory, and—most importantly—that Collins voluntarily chose to respond to the RFP and to do so using Victory as a supplier. Collins' solicitation of Victory in Oklahoma was volitional and not a fortuitous contact based entirely on the unilateral actions of others.

Further, Collins spent months negotiating with Victory and working through issues surrounding product specifications, materials, and pricing. On its face, the agreement being negotiated anticipated an interactive relationship that would include at least 46 weeks of work done in Oklahoma followed by delivery to—and other services provided in—Pennsylvania. In fact, the parties' relationship related to this contract spanned over three years, from March 2021 through at least December 2024. During their relationship, the parties communicated through over one hundred phone calls and hundreds-to-thousands of emails. *See Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1277–78 (10th Cir. 2005) ("Although phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts, such materials provide additional evidence that [the defendant] pursued a continuing business relationship with a [forum] corporation." (citation modified)). Over the course of this relationship, Collins also submitted several payments to Victory in Oklahoma.

For these reasons, the case is much more akin to those where courts have found purposeful direction to exist. *See, e.g.*, *Victory Energy Operations, LLC v. Legacy Mech., LLC*, No. 20-CV-157-GKF-JFJ, 2020 WL 7014595, at *3 (N.D. Okla. June 15, 2020) (defendant solicited plaintiff to manufacture boilers in Oklahoma; the parties exchanged numerous pre-proposal communications, entered change orders, and exchanged numerous communications regarding design drawings; and the defendant submitted several payments to plaintiff in Oklahoma); *Oswalt Equip. Co. v. La Madeleine de Corps, Inc.*, No. CIV-08-1039-HE, 2008 WL 11338390, at *3 (W.D. Okla. Nov. 3, 2008) (defendant solicited plaintiff's business in Oklahoma, supplied information and specifications to allow plaintiff to design equipment, and made partial payment to plaintiff in Oklahoma); *Art of Manliness, LLC v. UrbanDaddy, Inc.*, 478 F. Supp. 3d 1191, 1200 (N.D. Okla. 2020) (defendant chose to continue relationship with plaintiff even after learning of its presence in Oklahoma). The cases cited by Collins are far removed from the facts in this case and are unpersuasive. *See, e.g.*, *CMI Roadbuilding, Inc. v. Wiregrass Constr. Co., Inc.*, No. CIV-20-832-D, 2021 WL 2188807, at *3–4 (W.D. Okla. May 28, 2021) (contract with Oklahoma-based company for equipment manufactured in Iowa and shipped to Alabama, which never entered Oklahoma, as well as contract for relocation of a plant in Alabama); *Dental Dynamics, LLC v. Jolly Dental Grp., LLC*, 946 F.3d 1223, 1230 (10th Cir. 2020) (Oklahoma plaintiff served as broker for dentists across the United States, with contract at issue concerning the sale of a single piece of equipment that never entered Oklahoma); *Stillings Transp. Corp. v. Robert Johnson Grain & Molasses Co.*, 413 F. Supp. 410, 412 (N.D. Okla. 1975) (finding nonresident buyer less likely to be subject to personal jurisdiction where seller is the aggressor).

### c.    Victory's Alleged Injuries Arise Out of Collins' Forum-Related Activities

Further, Victory's claimed injuries arise out of these activities, even if the Court uses the most restrictive, causation-based approach. The Tenth Circuit has "interpreted the 'arise out of' language to require some sort of causal connection between a defendant's contacts and the suit at issue." *XMission, L.C. v. PureHealth Rsch.*, 105 F.4th 1300, 1312 (10th Cir. 2024) (citation modified); *see also id* at 1313 n.13 (noting this causation requirement may be in tension with Supreme Court pronouncements that specific jurisdiction does not require proof of causation). Traditionally, the Circuit has looked at both but-for and proximate cause approaches, without picking one or the other. *Id.* at 1313 n.13. The proximate cause approach is the more restrictive. *Newsome*, 722 F.3d at 1270. Under the proximate cause approach, the Court examines whether any of the defendant's forum contacts are relevant to the merits of the plaintiff's claim; that is, whether there is a nexus between the contacts and the claim. *XMission*, 105 F.4th at 1313. Collins' contacts easily meet this test.

Collins' contacts with Oklahoma involved the negotiation, execution, and performance of the contract under which Victory is now suing. Collins tries to avoid this nexus by asserting that the specific invoices that remain unpaid relate to work performed in Pennsylvania. But the Court looks to Victory's alleged injuries and whether those arise out of Collin's Oklahoma-related activities. Here, the alleged injury is that Victory has not been paid. Collins' Oklahoma contacts are relevant to whether the contract exists and any dispute as to its terms (as is amply demonstrated by the consent-based personal jurisdiction discussion above). Victory also asserts an unjust enrichment claim, based on its failure to receive payment for the benefit it provided to Collins. There is a strong nexus

22

between Collins' Oklahoma contacts and Victory's claim. *See, e.g.*, *Victory*, 2020 WL 7014595, at \*4 (finding injuries arose out of defendant's solicitation of the plaintiff, the formation of a contract, and subsequent change orders, as well as the refusal to pay for services that would cause foreseeable injuries in Oklahoma).

Collins purposefully directed its activities at Oklahoma, and Victory's alleged injuries arise from that purposeful direction. Victory has shown minimum contacts with Oklahoma.

### 3.    Collins Has Not Shown That Exercising Personal Jurisdiction Would Be Unreasonable

As noted above, the personal jurisdiction inquiry does not stop at the minimum contacts determination. The Court must also decide whether exercising such jurisdiction would offend traditional notions of fair play and substantial justice. *TH Agric.*, 488 F.3d at 1287. "[I]t is incumbent on [the defendant] to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 909 (10th Cir. 2017) (citation modified). To assess this, the Court weighs

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*TH Agric.*, 488 F.3d at 1292 (citation modified). The Court also takes into account the strength of the minimum-contacts showing, evoking a sliding scale where "the weaker the plaintiff's showing on minimum contacts, the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Id.* (citation modified)

Here, Collins has not shown that exercising jurisdiction is unreasonable. First, there is some burden on Collins in litigating the case in Oklahoma, as it is a company located in Pennsylvania.[12] But, were the matter litigated elsewhere, there would be a burden on Victory, who has provided evidence that its witnesses are located in Oklahoma. One side must always bear the inconvenience of litigating "on the road."[13] *Dudnikov*, 514 F.3d at 1081. Collins offers no evidence "that their defense of this case would be hindered by the territorial limits on the [Oklahoma] district court's power to subpoena relevant witnesses, or indeed hampered in any other significant way." *Id*. This factor is neutral, at best.

Second, Oklahoma has an interest in resolving this dispute. Victory is headquartered in Oklahoma, and the effects of this dispute will be felt here. *See, e.g.*, *Victory*, 2020 WL 7014595, at *5 (looking to the defendant's principal place of business); *see also OMI Holdings*, 149 F.3d at 1096 ("States have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors."). It is true that Victory is an LLC owned by a Maryland corporation that, in turn, has a principal place of business in Texas. Collins latches onto this fact, which is extremely relevant when deciding diversity jurisdiction. *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1238 (10th Cir. 2015). But Collins fails to explain why

---

[12] Collins also argues that the "vast majority of the evidence, including witnesses from [Collins], are in Pennsylvania" (Dkt. No. 12 at 21), but it has provided no evidence to support this argument other than a vague statement that another company conducted work on the boilers in Pennsylvania and Collins disagreed with the amounts due based on that work (Dkt. No. 12-1 at 4–5, ¶¶ 20–21).

[13] "Nevertheless, it is also true that 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.'" *AST Sports*, 514 F.3d at 1061 (quoting *Burger King*, 471 U.S. at 474)).

this quirk of federal procedural law would have any effect on how the State of Oklahoma values the resolution of disputes involving entities located within its borders.  Oklahoma should have the same interest in litigation affecting an entity with its principal place of business in Oklahoma regardless of whether that entity is a corporation or, in this case, an LLC.

Further, Oklahoma has an additional interest in resolving this case to the extent Oklahoma law applies to the parties' dispute.  *AST Sports*, 514 F.3d at 1062.  So far, all parties have treated Oklahoma law as governing the formation and interpretation of the contract, without regard to any choice-of-law provisions contained in that contract.  This factor weighs in favor of jurisdiction.

Third, Victory's interest in receiving convenient and effective relief appears unaffected by whether this Court exercises jurisdiction.  *Cf. id* (finding factor favoring jurisdiction where it was questionable whether the plaintiff could receive convenient and effective relief in a foreign jurisdiction).  This factor is neutral.

Fourth, Oklahoma appears to be the most efficient place to adjudicate this dispute. For this factor, the Court considers "the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation." *OMI Holdings*, 149 F.3d at 1097 (citation modified).  Here, the witnesses appear to be in Oklahoma and Pennsylvania.  (In its reply, Collins adds, without support, that additional witnesses are in Connecticut (Dkt. No. 30 at 2).)  The complained-of wrong was Collins' failure to pay Victory's invoices, and prior practice indicates the invoices were paid to Victory in Oklahoma.  As noted above, the parties have treated Oklahoma law as governing their contractual dispute.  And there is no other known litigation related to this matter, so no danger of piecemeal litigation.

Fifth, the Court considers "the interests of the several states, in addition to the forum state, in advancing fundamental substantive social policies." *OMI Holdings*, 149 F.3d at 1097. Collins argues Pennsylvania has a special interest in "advancing the policies of fair construction practices on public projects," because the contract in this case relates to materials ultimately provided to a public university. (Dkt. No. 12 at 22.) But Collins provides no legal support for the contention that a state has a fundamental social policy interest in adjudicating a dispute between two private contractors that happen to do work on public property. Nor does Collins provide facts indicating that its potential liability for some $422,000 in allegedly unpaid invoices will have any effect on the State of Pennsylvania, its universities, or any future public works in that State. At best, this factor is neutral.

The exercise of personal jurisdiction in Oklahoma is reasonable and does not offend traditional notions of fair play and substantial justice. Therefore, Collins' motion to dismiss for lack of personal jurisdiction will be denied.

## II. Collins' Motion to Transfer Venue

Collins next asks the Court to transfer this case to the Eastern District of Pennsylvania for the convenience of the parties under 28 U.S.C. § 1404(a). (Dkt. No. 12 at 23–25.)

Where, as here, the parties have agreed to a forum-selection clause, this motion is easily decided. "[A] proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 59–60 (2013) (citation modified). No party asserts this is an exceptional case. The parties' choice of forum will control, and the Court will deny Collins' motion to transfer on this basis.

Even lacking a forum-selection clause, the Court would decline Collins' request. Section 1404 allows the Court to transfer a case for "the convenience of parties and witnesses, in the interest of justice . . . ."[14]  28 U.S.C. § 1404(a).  As the party seeking transfer, Collins "bears the burden of establishing that the existing forum is inconvenient." *Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1515 (10th Cir. 1991).  This is a case-by-case consideration within the discretion of the Court. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  Factors to be considered include (1) the plaintiff's choice of forum; (2) the accessibility of witnesses and other sources of proof, including the availability of compulsory process; (3) the cost of making the necessary proof; (4) the enforceability of any judgment obtained; (5) relative advantages and obstacles to a fair trial; (6) difficulties that may arise from congested dockets; (7) whether questions exist in the area of conflicts of law; (8) the advantage of having a local court determine questions of local law; and (9) all other practical considerations that make a trial easy, expeditious, and economical.  *Chrysler Credit*, 928 F.2d at 1516.  It is not permissible, however, to merely shift "the inconvenience from one side to the other."  *Emps. Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1167 (10th Cir. 2010) (citation modified).

First, the Court notes that Victory has chosen the current forum.  Second, Collins has provided precious little information regarding the accessibility of proof.  Instead, Collins vaguely notes that the unpaid invoices relate to work done in Pennsylvania and argues that the work was done by a company from Connecticut.  Collins, however,

---

[14] Section 1404 requires any transfer be made to a district or division where the case might originally have been brought or to which all parties have consented. *Id.*  The parties do not dispute that the case could originally have been brought in the Eastern District of Pennsylvania.

provides no detail as to the nature of the dispute, such as whether it will require an examination of the boilers in Pennsylvania. Nor does Collins provide any specifics as to which witnesses, with what knowledge, are located where. Collins further provides no details as to why such witnesses will not be accessible if the case remains in this Court. Third, Collins provides nothing regarding potential costs. Fourth, Collins notes that judgments are often more easily enforced where the defendant resides, but it does not assert that enforceability will be an issue. Fifth and Sixth, Collins notes no advantages or obstacles to a fair trial, nor does it point to difficulties from congested dockets. Seventh and eighth, Collins again appears to agree that Oklahoma law will govern this case, but notes that Pennsylvania's law under the UCC is almost identical. And ninth, Collins points to no other practical considerations.

Faced with such little detail, the Court finds Collins has failed to meet its burden of establishing that the Northern District of Oklahoma is inconvenient. At best, Collins simply seeks to shift burdens from itself to Victory.

Collins motion to transfer will be denied.

### Conclusion

IT IS THEREFORE ORDERED that *Defendant Collins & Collins Mechanical, Inc.'s Motion to Dismiss or, in the Alternative, Transfer Venue* (Dkt. No. 12) is DENIED.

ORDERED this 24th day of July, 2026.

SUSAN E. HUNTSMAN, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

28